Van Brunt, P. J.
No claim is made by the contestants upon this argument, that there was any defect in the formal execution of the will, or that the decedent was lacking in capacity to make a proper will, or that any influence was-exercised over her which is known to the law as undue.
The ground, however, upon which the will is assailed, is that at the time of making the same, the testatrix was laboring under an insane delusion in respect to those who would have been the objects of her testamentary bounty, and that the dispository provisions in her will were or might have been caused or affected by such delusion.
In support of this claim a large mass of testimony was introduced upon the trial before the surrogate, considerable of it being for the purpose of showing that the testatrix had been for a long period of time, prior to the execution of the will in question, addicted to the use of intoxicating drinks, and the balance to establish the fact that the testatrix was laboring under a monomaniacal delusion in respect to her brother and sisters, which had no existence except in her distempered imagination.
It will not be attempted, in this opinion, to review, in detail, all the evidence which has been introduced, upon the part of the contestants, for the purpose of establishing these two propositions, or the evidence introduced, upon the part of the proponents, for their reputation.
A general examination of the situation of the parties, of the acts and doings of the testatrix, of her habits and of' the nature of the alleged delusion, and an examination of the question as to whether such delusion was the result of her own distempered imagination, or had its basis in the existence of facts which the testatrix had reason to believe, will clearly indicate that the testatrix was not laboring under such a delusion at the time of the making of her will, as to render it invalid.
The father of the testatrix died in the year 1870, having lived, for a considerable period of time, at No. Í09 East Seventeenth street, leaving him surviving his widow, a son, who was married, and four daughters, two of whom were married.
He left an estate of about $400,000, which, with the exception of some small legacies, was ultimately to be divided amongst his children. At the time of his death his unmarried daughters, Charlotte and Harriet, lived with him in the house in Seventeenth street, and they, with their mother,, continued there to live until the mother’s death in 1872.
*431 In October, 1873, the father’s estate was finally settled, the two unmarried sisters, Charlotte and Harriet, receiving, as their part of their father’s estate, from $75,000 to $80,000 apiece. The house in Seventeenth street was set off to Charlotte and Harriet at a valuation of $40,000. Charlotte and Harriet continued to live upon the said premises until Charlotte’s death, which occurred in October, 1875. Harriett remained upon the premises until the spring of 1876. Up to the time of the death of Charlotte, her brother, John L. Gross, retained possession of Charlotte’s and Harriet’s share of the father’s estate, and paid over to them the income of the same as they demanded.
It would appear that, during the mother’s life-time, the mother made some informal gift to Charlotte and Harriet of the goods within the house, and certain presents which she had received, and also moneys received from her husband, and that there was an understanding between Charlotte and Harriet that, as far as this property was concerned, the survivor should retain it. It further appears that, prior to the death of Charlotte, John L. Gross had spent $22,000 of Charlotte’s money without her knowledge or consent. It is true that upon his axamination, before the surrogate, in these proceedings, he denied having made use of it, but, upon being cross-examined upon this subject, he very soon acknowledged the fact so to be.
John L. Gross was a member of the firm of Gross, March & Co., and finding that said firm was about to fail, in order to secure Charlotte for the money which he had thus appropriated, he executed and delivered to Charlotte on the 15th of March, 1875, a second mortgage upon his house, No. 11 West Seventeenth street. Incumbering it by this mortgage to the amount of $37,000, being the full value of the premises. Gross, March & Co. failed on the 18th or 20th of March, 1875, and made a compromise with their creditors, paying sixty cents upon the dollar.
After the death of Charlotte, her brother and sisters insisted upon their share of the property in the house in Seventeenth street, and Harriet thinking she was entitled to some of it, under the gift from her mother, and to other portions of it because of the arrangements made with Charlotte, felt that she was being wronged by her brother and sisters in their making the claims which they did upon this property.
It further appears that while her brother, John L. Gross, was in the possession of her property, Harriet spent more money than her income warranted, and had great difficulty in getting money from her brother, and that he upbraided her for her extravagant habits.
*432 The result of these transactions was an estrangement between Harriet and her brother and sisters. Litigations wére commenced by her to establish what she claimed to be her rights. Her brother and sisters insisted upon their rights, and that they should have all that the law gave them, and they got it.
Just prior to the time which was appointed for the division of Charlotte’s estate in 1878, John L. Gross and Harriet’s sisters joined in a petition to the supreme court, alleging that Harriet was incapable of managing her affairs, and that she was particularly susceptible from her mental weakness of being imposed upon and deprived of her property, and asked that a commission in the nature of a writ de lunático inquirendo might issue to inquire into-the lunacy of said Harriet Gross, and in connection with that proceeding obtained an injunction against persons who-had in their possession property belonging to their sister, from paying it over. Upon a motion being made to the court upon affidavits of those persons who had known Miss Harriet Gross and were acquainted with her mental condition, these proceedings were set aside, the injunction vacated and her property restored to her. These proceedings were published in the newspapers, and Harriet felt that she had been greatly disgraced and humiliated by the attack which had thus been made upon her, and they were of an nature which were not particularly apt to engender friendly feelings upon the part of Harriet, who already had some suspicions in reference to the conduct of her brother, and which, it seems, were not entirely unfounded. Her relatives undoubtedly thought her extravagant; that she ought to live within her income, and that it showed gross improvidence upon her part to spend any part of her principal, and upon which they probably felt that they had a hen.
At a period anterior to the institution of these proceedings, in consequence of what had transpired, Miss Gross-had refused to have any intercourse with her brother and sisters. In the year 1881 she made a will, by which she bequeathed all her property to societies and persons other than her brother and sisters, and on the 10th of November, 1884, she made the will admitted to probate. By this will no part of her property was bequeathed to her brother and sisters, the contestants herein. She died on the 27th of November, 1884. It is in proof that from the time of the death of her sister Charlotte, her most engrossing subject of conversation was the wrongs which had been done her by her relatives, and it is largely upon this fact that the claim of the contestants is founded. In this connection it is to be observed that the testatrix seems to have been an exceedingly *433 illiterate woman for her position in society; she appears to have had no source of amusement within herself. She did not read books; she mixed but little in society and led a somewhat lonely and solitary life, and her grievances were uppermost in her mind and naturally formed the subject of her conversations. It is true also that there is evidence in the case tending to show that she was dull in her comprehension of business matters. But her stupidity or want of intelligence in that respect is no greater than that of many persons who are not particularly "conversant with business, and especially those of whom we have heard tell that they did not understand how it was that a bank account could be exhausted when there were checks unused still left in the check book. She made confusion in her accounts with her bankers by a failure to credit deposits and charge checks, and she could not at first appreciate the fact that a consumption of principal necessarily diminished income. These circumstances, although they indicate dullness of comprehension, by no means establish or even tend to establish such a weakness of intellect as that she was unable to apprehend the circumstances surrounding her.
Neither is there any evidence going to show that the use of intoxicating liquors in any way impaired her mental faculties, or that at the time at which the act in question was done she was in any way incapacitated by present in - toxication.
Upon an examination of the evidence, it will appear, we think, without exception, that each one of the witnesses who describes the manner of Miss Gross to have been violent and that she was excitable and coarse in her conduct, states in connection with that evidence that at the very time at which these symptoms exhibited themselves the witness believed her to have been under the influence of liquor.
There is no occasion on which her conduct was criticised by the witness as being of an extraordinary character, but that it is immediately coupled with the inference of the witness that she was under the influence of spirituous liquors. This circumstance of itself, if true, would tend to account for her extravagance of language and excitable conduct and declarations In that condition, she would naturally refer to the subject upon which her mind most frequently dwelt, namely, the wrongs which had been done her by her relatives.
An examination of this evidence, however, does not satisfy us that she was addicted to this habit to the extent with which she is charged by the contestants.
The evidence describes her as being a person extraordina *434 :rily neat in her personal appearance, and careful in respect thereto, and of this there is no denial; and to many of the witnesses, she exhibited herself as a person of refined and ladylike appearance and manners.
The question, therefore, arises, is there any proof that Harriet Gross was laboring under a delusion in respect to those who would naturally have been the objects of her testamentary bounty, having no existence except in her own heated imagination?
She believed that she had been wronged, and she so asserted repeatedly. She thought that she had been treated unjustly and harshly, and not as she had a right to expect, and that advantage had been taken of her by her brother and sisters. It has already been seen that these' conclusions, at which she had arrived, were not entirely without foundation.
It may be true that her ideas in regard to what were her rights, and what was due to her, may not have been valid in law. But still they existed, and had some foundation for their existence, and were not merely the creatures of her imagination. She felt that her sister and herself had been overreached in having the house in Seventeenth street set apart to them at the excessive valuation of $40,000, which house was sold in 1879 for $18,500. It is true, that between 1873 and 1879, there had been a great depreciation in real estate, but the difference in the price at which they took the house and the price at which it was sold, naturally produced its effect upon her mind. It is true, that her brother says he tried to dissuade his sisters from taking the house, but it does not appear in what particular form this protest upon his part was made. Harriet thought that she had a right, in consequence of gifts from her mother and sister, to certain of the property in the house in Seventeenth street. Her brother and sisters disputed this right. They insisted upon all that the law would give them, as has been previously stated, and Harriet felt herself to have been wronged by their action in this respect. There is no proof that this was an insane delusion. It had its foundation in the belief that she had certain rights, which, perhaps, the law did not recognize.
It is said that it was an insane delusion on her part to doubt the integrity of her brother, when his accounts in reference to her father’s and sister’s estates were passed and found to be correct. In view of the fact that he had appropriated $22,000 of her sister’s property, without her leave or •consent, and had, upon the eve of his failure, attempted to secure it by a mortgage upon property which was of no greater value than the incumbrances upon it, this impression derogatory to the absolute integrity of the conduct of *435 her brother John, in monetary affairs, does not seem to have been without some foundation; and it appears, from the evidence that the only way in which Charlotte’s estate was made whole, in respect of this $22,000, was because those mortgages were charged to John in the settlement of the accounts. That she had good reason to doubt the friendly feelings of her brother and sisters toward her, and that they were grasping for her property before her death, as though they had some lien upon it, is evidenced by the attempt to have her declared a lunatic, and have a committee of her property appointed. These proceedings were initiated when it was found that she intended to take her property into her own possession and control, and seem, in view of the subsequent proceedings, to have been undertaken without the slightest evidence which justified their institution. Under all these circumstances, it is not at all strange that she should not have cherished the most kindly feelings for her relations. She may have been a person hard to get along with; she may have been excitable; she may have been arbitrary; she may not have been as thrifty, in respect to her property, as her brother and sisters, or perhaps as we ourselves might think she ought to have been; but the property was her own, she had a right to spend it as she pleased, and whether she exceeded her income or not, was no ground for attempting to take her property out of her possession.
Her brother and sisters insisted upon their legal rights in regard to the property of Charlotte and her mother, which Harriett claimed, and those legal rights they seem to have obtained. Harriett, in the disposition of her property, has exercised her legal right, and because of her so doing, the relatives, who had insisted upon their legal rights to her detriment, have no particular reason to complain.
The claim that the testatrix did not appreciate her surroundings because of the bequest to Dr. John Hall, designating him as her beloved pastor, does not seem to have any foundation. It appears that both her father and mother were members of Dr. Hall’s church, and had been accustomed to attend regularly the services of that church, that the family had been accustomed to go there, that Dr. Hall during the whole of her life, had been accustomed to call upon her as her pastor, and that she had formed no other church connections, and although it does not appear that she went to his church after its removal from down, town to the corner of Fifth avenue and Fifty-fifth street, it is very evident that she was considered by Dr. Hall as a. member of his congregation, and that she acknowledged the relationship.
The testimony in regard to the Ohio Canal bonds, is the *436 ■only evidence which seems to show a want of recollection upon the part of the testatrix, in reference to her monetary affairs. It appears from the evidence that she made some claim upon her brother because of certain Ohio canal bonds, and there is no proof that such bonds had ever belonged to her, or to her father’s estate. It does appear, however, that her father in his life-time had owned certain Ohio canal bonds, which had been paid off prior to his death, and that therefore, her impressions and records to the connection between the Ohio canal bonds and her father’s estate, were not entirely without foundation. It is fair to assume that during her father’s lif e-time, she had heard of these Ohio canal bonds, and that she thought they formed part of her father’s estate at his death, not being aware of the fact of their having been paid off, and no account being given by the «executor of these bonds she unjustly assumed that she had been injured in some way, in connection with those investments. But this fact by no means, even tends to establish that she was the victim of an insane delusion, which incapacitated her from either managing her own affairs or disposing of her own property.
The letters to which our attention has been called, are certainly, as has been stated by the learned surrogate, “veryextraordinary productions.”
It would seem that when commenced, they had been intended as a sort of Christmas greeting, but the subject appears to have grown under her pen, and a physical infirndity in her fingers, preventing her from writing much at a time, and the gratification of her evident desire to ease her mind by saying what she had to say requiring more time than had been anticipated, prevented the sending of the letters until long afterwards.
At first blush they appeared to be entirely incoherent, and without any intelligent purpose, but a knowledge of her situation, and of that of those to whom they were addressed, enables us to see an intelligent fixed purpose in their production. They are illiterate in the extreme, but the errors which appear in them are only those which would be found in the production.of any person unaccustomed to writing, and whose education had been of the most limited kind. It does not appear that she ever did write, or compose better, and there is no claim but that prior to her mother’s death, her mind was entirely sound.
The examination of the evidence in the case leads inevitably to the conclusion that the testatrix was a woman of an arbitrary temper, ignorant and illiterate, and, therefore, suspicious, dull of comprehension, and with no business habits or ideas, and, therefore, most difficult to get along with in reference to any of her affairs, but that her *437 intellect was so weak or her will so perverted that she had lost all control of herself, is far from being established. Upon the contrary she had very definite ideas as to her wishes and dislikes, which, although magnified by her peculiar temperament, had a source of which she had a very clearly defined notion.
There seems to be no reason shown why we should interfere with the conclusion of the learned surrogate, and the decree appealed from should be affirmed.
Brady and Daniels, JJ., concur.